2013 ND 193

**Shealeen HILLERSON as best friend to T.D., and T.D., Plaintiffs and Appellants**

v.

**BISMARCK PUBLIC SCHOOLS and Mandan Parks and Recreation, and Missouri Valley Family Young Men's Christian Association, Defendants.**

**Missouri Valley Family Young Men's Christian Association, Appellee.**

No. 20130101.

Supreme Court of North Dakota.

Oct. 22, 2013.

Rehearing Denied Nov. 21, 2013.

Benjamin C. Pulkrabek, Mandan, ND, for plaintiffs and appellants.

Mark J. Condon, Bloomington, MN, for defendant and appellee.

VANDE WALLE, Chief Justice.

[¶ 1] Shealeen Hillerson, as "best friend" to T.D., a minor child, and T.D. appealed from a summary judgment dismissing their negligence lawsuit against the Missouri Valley Family YMCA for injuries T.D. suffered in a near-drowning accident while participating in a YMCA summer program. Because we conclude that the waiver of liability signed by T.D.'s mother is ambiguous, a question of fact exists as to the intent of the parties. We reverse the summary judgment and remand for further proceedings.

I

[¶ 2] In March 2008, Kristina and Brandon Dickerson enrolled their minor daughter T.D. in a summer Extended School Program ("ESP"). The ESP was run in conjunction by the YMCA, Bismarck Public Schools, and the Bismarck Parks and Recreation Department. The ESP was funded by a federal grant obtained by the Bismarck Public School District and the YMCA. The program was designed, in part, to provide summer educational opportunities "in a stimulating, safe, drug-free, supervised environment to a large number of at-risk students." Before enrolling her daughter in the program, T.D.'s mother filled out a YMCA registration form that contained two release of liability provisions. T.D.'s mother signed the release of liability provisions. T.D. did not sign the release. The waiver provisions provided:

I understand that the Bismarck ESP does not carry medical, dental or eye glass insurance and that I will be responsible for any medical charges my

child may incur. I hereby release the Missouri Valley Family YMCA and Bismarck Public Schools from any liability.

. . . .

My child has my permission to attend/participate in all field trips unless otherwise stated by me in writing directly to the Site Coordinator. I understand that the Bismarck ESP does not carry medical, dental or eye glass insurance and that I will be responsible for any medical charges my child may incur. I hereby release the Missouri Valley Family YMCA and Bismarck Public Schools from any liability.

At the bottom of the YMCA registration form, T.D.'s mother also signed a certification clause stating, "I certify that the above information is true to the best of my knowledge and I understand the Missouri Valley Family YMCA is not responsible for accidents." In May 2008, T.D. and her older sister, who was also a minor child at the time of the incident, were accepted into the program. T.D. and her sister each received a full scholarship for the program for the entire summer.

[¶ 3] On June 13, 2008, T.D., who was six years old at the time of the incident, went to the Mandan Community Center swimming pool with approximately forty-two other children and seven adults as part of the program. The YMCA states in its brief that the number of staff members exceeded the state and county's child-to-adult ratio requirements. While at the pool, T.D. was found unresponsive and submerged in the three-foot-deep end of the water. It is unclear how T.D. entered the water. As a result of her near-drowning and oxygen deprivation, T.D. suffered debilitating injuries including hypoxic brain injury and hypoxic ischemic encephalopathy.

[¶ 4] In March 2011, Hillerson, as best friend to T.D., and T.D. filed suit against the Bismarck Public Schools and Mandan Parks and Recreation, alleging the entities were negligent "by failing to provide appropriate supervision, failing to provide safe facilities and equipment, failing to warn of the dangers associated with a swimming pool, failure to properly train its employees and in such other ways as will be established at the time of trial." T.D. later amended her complaint to include the YMCA as a defendant. Bismarck Public Schools and Mandan Parks and Recreation settled the claims against them and are no longer parties to the suit.

[¶ 5] The YMCA moved for summary judgment, arguing the release of liability signed by T.D.'s mother relieved the YMCA of any liability for T.D.'s injuries. In February 2013, the district court granted the YMCA's motion for summary judgment, concluding the release of liability provisions exonerated the YMCA from liability for the injuries T.D. suffered while in the program. The district court found the release in the instant case was "nearly identical" to the release of liability language found in *Kondrad ex rel. McPhail v. Bismarck Park Dist.*, 2003 ND 4, 655 N.W.2d 411.

## II

[¶ 6] On appeal, T.D. asserts the district court erred in granting summary judgment in favor of the YMCA because the release of liability provisions did not exonerate the YMCA from liability for its alleged negligence.

[¶ 7] This Court's standard of review for summary judgment is well-established:

> Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In determining whether summary judgment was appropriately granted, we must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the record. On appeal, this Court decides whether the information available to the district court precluded the existence of a genuine issue of material fact and entitled the moving party to judgment as a matter of law. Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record.

*Missouri Breaks, LLC v. Burns*, 2010 ND 221, ¶ 8, 791 N.W.2d 33.

[¶ 8] The party opposing summary judgment cannot "simply rely upon the pleadings or upon unsupported, conclusory allegations." *Spratt v. MDU Res. Grp., Inc.*, 2011 ND 94, ¶ 7, 797 N.W.2d 328. The nonmoving party "must set forth specific facts by presenting competent, admissible evidence, whether by affidavit or by directing the court to relevant evidence in the record, demonstrating a genuine issue of material fact." *Id.* Additionally, we have stated, the onus is on the party opposing summary judgment to draw the court's attention to relevant evidence in the record; "the court has no duty to scour the record for evidence that would preclude summary judgment." *Tarnavsky v. Rankin*, 2009 ND 149, ¶ 8, 771 N.W.2d 578.

## III

[¶ 9] On appeal, T.D. contends the language of the waiver signed by her mother did not release the tort claim of the child. The YMCA argues T.D.'s contentions are unsupported statements that are not part of the record. We agree with the YMCA. Our review of the record reveals that T.D. failed to adequately allege the waiver did not apply to her as a child, thus, the argument is not proper on appeal. Issues not raised in the trial court cannot be raised for the first time on appeal. *Alerus Fin., N.A. v. Lamb*, 2003 ND 158, ¶ 17, 670 N.W.2d 351. "Evidence which does not appear in the record of the [district] court proceedings cannot be considered by this Court on appeal." *Arndt v. Maki*, 2012 ND 55, ¶ 15, 813 N.W.2d 564.

[¶ 10] At the summary judgment proceeding, the only semblance of an argument that the mother's waiver did not apply to T.D.'s potential cause of action is found in the following statements made by her attorney at the hearing: "[*Kondrad* is] more specific. It deals with physical injuries. It talks about assumption of risk. It talks about the waiver of claims and not only waives them for the mother, it waives them for the child, and it refers to program and just civil liabilities." The argument was not expounded further. Because T.D. failed to allege at the trial court level that the release signed by her mother did not waive T.D.'s own potential cause of action, we do not consider whether a pre-injury waiver of liability signed by a parent affects the potential claims of the child.

## IV

[¶ 11] T.D. additionally argues the YMCA was precluded under N.D.C.C. § 9–08–02 from exonerating itself from willful acts. Under N.D.C.C. § 9–08–02, "contracts which have for their object, directly or indirectly, the exempting of anyone from responsibility for that person's own fraud or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." "Generally, the law does not favor contracts exonerating parties from liability for their conduct." *Kondrad*, 2003 ND 4, ¶ 6, 655 N.W.2d 411; *see also Reed v. Univ. of North Dakota*, 1999 ND 25, ¶ 22, 589 N.W.2d 880. However, parties to an otherwise lawful contract are still bound by the clear and unambiguous language "evidencing an intent to extinguish liability, even though exculpatory clauses are construed against the benefitted party." *Kondrad*, at ¶ 6.

[¶ 12] The YMCA again contends T.D. failed to allege the YMCA acted willfully, intentionally, or grossly negligent, and thus, her argument is improper here. In T.D.'s original complaint and amended complaint, she only alleged the YMCA was "negligent, among other things, by failing to provide appropriate supervision, failing to provide safe facilities and equipment, failing to warn of the dangers associated with a swimming pool, failure to properly train its employees and in such other ways as will be established at the time of trial." The complaint further states that "as a direct and proximate cause" of the YMCA's negligence, T.D. "sustained and will in the future sustain medical expenses for her care, treatment and other economic losses." The complaint is devoid of any language pertaining to intentional or willful conduct on the part of the YMCA.

[¶ 13] At the summary judgment hearing, T.D.'s attorney, referring to *Kondrad*, stated, "you can argue invalidity because of the liability from intentional or willful acts ... this case hasn't gone to trial yet and I would make a motion then at this point that I would be allowed to amend my

complaint." The district court instructed that if T.D. wanted to make the motion, she was to put it in writing. The complaint was never amended to include intentional and willful acts or gross negligence.

[¶ 14] The YMCA argues that in cases that have actually asserted intentional and willful acts, those theories have been "stated distinctly from other claims for relief." In support of its contention, the YMCA points to *Kautzman v. McDonald,* 2001 ND 20, ¶ 8, 621 N.W.2d 871, in which this Court quoted specific allegations of the plaintiff's complaint that the defendants committed "intentional, wrongful, negligent, grossly negligent, and/or wilful acts." Our previous case law addressing pre-injury releases of liability support a general rule requiring specific pleading of intentional or willful conduct if a plaintiff is arguing the waiver violates N.D.C.C. § 9–08–02. For example, in *Reed,* this Court explained, "Reed's claims against NDAD are based on negligence, and he has not argued the release is invalid because it purports to exonerate NDAD from liability for intentional or willful acts." *Reed,* 1999 ND 25, ¶ 22 n. 4, 589 N.W.2d 880. Similarly, in *Kondrad,* this Court noted that the plaintiff's claim was not based on intentional or willful acts. *Kondrad,* 2003 ND 4, ¶ 8 n. 1, 655 N.W.2d 411. These cases should have put T.D. on notice to specifically plead intentional or willful acts in her complaint if that was what she was alleging.

[¶ 15] We conclude that T.D.'s complaint has only pled a negligence theory and not intentional or willful acts. Therefore, because the issue was not raised in the trial court, the issue of gross negligence, or intentional and willful acts, will not be considered here.

V

[¶ 16] T.D. contends that the release is ambiguous. The YMCA argues T.D. failed to raise the issue of ambiguity at the trial court level, and as a result, the issue cannot be raised for the first time on appeal here. While we are cognizant of the perfunctory nature with which the argument was haphazardly pled, both at the trial court level and on appeal, we construe T.D.'s argument to have raised the issue of ambiguity. Although she does not specifically articulate the waiver is ambiguous, in her summary judgment and appellate brief, T.D. does distinguish the facts and language of the release in *Kondrad* from the facts and language here. T.D. specifically argues in her appellate brief that the language in the release "is no where near as comprehensive and specific as the release" in *Kondrad.* We determine the issue of ambiguity was properly preserved.

[¶ 17] Where reasonable differences of opinion exist as to the terms of a contract, the contract is deemed ambiguous, and summary judgment is not appropriate. *See Golden v. SM Energy Co.,* 2013 ND 17, ¶ 13, 826 N.W.2d 610; *Hunt v. Banner Health Sys.,* 2006 ND 174, ¶ 18, 720 N.W.2d 49 (holding summary judgment was improper because ambiguities in an employee handbook created a question of material fact whether the handbook was intended by the parties to establish required terms of the employment contract).

[¶ 18] Because we conclude T.D. sufficiently argued the release was ambiguous, the issue here turns on the language of the release. When a contract is reduced to writing, the intent of the parties is to be ascertained from the writing alone, if possible. N.D.C.C. § 9–07–04. This Court also construes contracts "to give effect to the parties' intent, which, if possible, must be ascertained by giving meaning to each provision of the contract." *Reed,* 1999 ND 25, ¶ 25, 589 N.W.2d 880. Whether a written contract is ambiguous

is a question of law, and this Court will "independently examine and construe the contract to determine if the trial court erred in its interpretation of it." *Kondrad*, 2003 ND 4, ¶ 6, 655 N.W.2d 411. "[A] contract is ambiguous when reasonable arguments can be made for different positions on its meaning." *Moen v. Meidinger*, 547 N.W.2d 544, 547 (N.D.1996). This Court has also stated:

"A determination of ambiguity is but the starting point in the search for the parties' ambiguously expressed intentions," since an ambiguity creates "questions of fact to be determined with the aid of extrinsic evidence." *Bohn v. Johnson*, 371 N.W.2d 781, 788 (N.D.1985). When the terms of a contract are ambiguous, "extrinsic evidence of the parties' intent may be considered and the terms of the contract and the parties' intent become questions of fact." *Wachter Development, L.L.C. v. Gomke*, 544 N.W.2d 127, 131 (N.D.1996). As *National Bank of Harvey [v. Int'l Harvester Co.*, 421 N.W.2d 799, 803 (N.D.1988) ], explained, the resolution of an ambiguity with extrinsic evidence requires the trier of fact to make a finding of fact.

*Bendish v. Castillo*, 2012 ND 30, ¶ 16, 812 N.W.2d 398 (quoting *Moen*, 547 N.W.2d 544, 547 (N.D.1996)).

[¶ 19] T.D. specifically argues the district court erred in its reliance on *Kondrad* in granting summary judgment because the release in the instant case does not speak to the issue of damages or losses. In *Kondrad*, a minor child and his mother brought a negligence action against the Bismarck Park District for injuries the child sustained from a bicycle accident that occurred while he was participating in an after school program run by the Park District. *Kondrad*, 2003 ND 4, ¶ 1, 655 N.W.2d 411. In order for her child to participate in the after school program, the mother signed a release of liability. The waiver contained the following release language:

I recognize and acknowledge that there are certain risks of physical injury to participant in this program and I agree to assume the full risk of any such injuries, damages or loss regardless of severity which I or my child/ward may sustain as a result of participating in any activities associated with this program. I waive and relinquish all claims that I, my insurer, or my child/ward may have against the Park District and its officers, servants, and employees from any and all claims from injuries, damages or loss which I or my child/ward may have or which may accrue to me or my child/ward on account of my participation of my child/ward in this program.

*Id.* at ¶ 5. This Court held that the waiver and release signed by the child's mother was clear and unambiguous and exonerated the Park District for its alleged negligence. *Id.* at ¶ 7. Although the injury occurred from an activity (riding a bike) that was not affiliated with the after school program, the waiver and release language was broad enough to exculpate the Park District of all injuries incurred by the child "on account of his participation in the program." *Id.* at ¶ 7. This Court also noted the plaintiff's claim was not based on intentional or willful acts, thus it did not address whether the waiver or liability would be effective against intentional or willful acts. *Id.* at ¶ 8 n. 1.

[¶ 20] We conclude the release presently before the Court is distinguishable from the release of liability at issue in *Kondrad*. In *Kondrad*, we held that the registration form signed by the mother contained separate and distinct assumption of risk and waiver clauses. *Id.* at ¶ 7. The unambiguous language of the release provided that the mother agreed to as-

sume the full risk of her child's injuries and damages arising from his participation in the program. *Id.* In addition to assuming the risk, we concluded the mother also unambiguously relinquished all claims for injuries and damages in order to allow her child to participate. *Id.*

[¶ 21] Here, looking at the release of liability provisions as a whole, we conclude reasonable differences of opinion and interpretations exist as to its meaning. Paraphrasing the first clause, the release essentially provides that the YMCA does not carry medical insurance and that the parent or guardian signing the release form "will be responsible for any medical charges" the child may incur. The second sentence then seeks to release the YMCA from "any liability." Reading the two sentences together, it is equivocal whether the "liability" referenced in the second sentence simply refers to the "medical charges" introduced in the first sentence, or whether it goes beyond medical charges to include damages. The use of the word "any" before the word "liability" may indicate the drafters intended to extend the scope of the waiver; however, we conclude reasonable differences of opinion arise as to whether the parameters of "any liability" extends to tort damages in this context.

[¶ 22] The second release clause provides, "[m]y child has my permission to attend/participate in all field trips unless otherwise stated by me in writing directly to the Site Coordinator." The clause then contains the same nebulous sentences as the first clause. Whereas the *Kondrad* release language specifically stated liability would be waived for "injuries, damages or loss," in the case at bar, it is reasonably debatable whether the release simply refers to medical expenses or alludes to something more. Unlike *Kondrad,* the face of the release here does not mention damages, torts, injuries, losses, or similar types of terms. Moreover, the clause could arguably be interpreted to serve as a medical emergency release allowing the YMCA to make prompt medical decisions for the child, in the event of an emergency, while the parent is temporarily unavailable. The third clause contained a certification statement and provided, the "YMCA is not responsible for accidents." In light of the language in *Kondrad,* which waived liability for "injuries, damages or loss," we are uncertain whether "accidents" refers to torts, medical expenses, or something more.

[¶ 23] Reading the three clauses together as a whole, the release is not clear as to what it is purporting to release. A reasonable interpretation may indicate the YMCA exculpated itself from medical expenses; however, it is unclear whether the release includes damages from torts, specifically negligence. The release is deficient of the specific and comprehensive language that was exhibited in *Kondrad.* Because the ambiguous waiver creates a question of fact to be determined by the aid of extrinsic evidence, summary judgment was inappropriate. We therefore hold that the release of liability in the instant case is ambiguous, and that the district court erred in granting summary judgment in favor of the YMCA.

## VI

[¶ 24] We reverse the district court's summary judgment and remand for further proceedings consistent with this opinion.

[¶ 25] DALE V. SANDSTROM and CAROL RONNING KAPSNER, JJ., concur.

MARING, Justice, dissenting.

[¶ 26] I respectfully dissent. I agree with the majority that the release of liabili-

ty in this case is ambiguous. However, I am of the opinion that the waiver of liability is void and unenforceable because it violates clear public policy. I would, therefore, reverse and remand this case for trial.

I

[¶ 27] Contracts exonerating parties from liability for their conduct are generally disfavored in the law. *Reed v. University of North Dakota*, 1999 ND 25, ¶ 22, 589 N.W.2d 880; *Kondrad v. Bismarck Park District*, 2003 ND 4, ¶ 6, 655 N.W.2d 411. "[C]ontractual exculpatory clauses are strictly construed against the benefitted party, and will not be enforced if they are ambiguous, or release the benefitted party from liability for intentional, willful, or wanton acts." *Reed*, at ¶ 22; N.D.C.C. § 9–08–02 (precluding contracts that exonerate parties from willful injury to the person of another as against public policy). Generally, releases of liability "are not construed to cover the more extreme forms of negligence, described as willful, wanton, reckless or gross, or to any conduct which constitutes an intentional tort." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 68, at 484 (5th ed.1984). Under N.D.C.C. § 9–08–01 (emphasis added),

Any provision of a contract is unlawful if it is:

1. Contrary to an express provision of law;

2. Contrary to the policy of express law, though not expressly prohibited; or

3. *Otherwise contrary to good morals.*

*See also Martin v. Allianz Life Ins. Co. of North America*, 1998 ND 8, ¶ 20, 573 N.W.2d 823. It is a "general rule that certain contracts though properly entered in all other respects, will not be enforced, or at least will not be enforced fully, if

found to be contrary to public policy." 15 Grace McLane Giesel, *Corbin on Contracts* § 79.1 (rev. ed., 2003).

[¶ 28] "The Restatement (Second) of Contracts section 178 provides that a court should refuse enforcement when a public policy against enforcement outweighs the interest in enforcement." 15 *Corbin, supra*, § 89.1.

The Restatement suggests that in making that determination the courts should consider the expectations of the parties, the forfeiture that would result from nonenforcement, any public interest in enforcing the provision, the strength of the policy against enforcement, whether nonenforcement will further that policy, the seriousness and deliberateness of the misconduct, and the closeness of the connection between the misconduct and the provision.

15 *Corbin, supra*, § 79.3 (citing Restatement (2d) of Contracts § 178 (1981)). The unenforceability of contracts contrary to public policy "is a clear limitation on the freedom of contract because, regardless of the parties' intention to be bound or manifestations of that intent, the courts have refused to give such contracts the full enforcement to which they would otherwise be entitled." 15 *Corbin, supra*, § 79.1. This course is only followed by courts "when necessary to protect a public interest offended by the contract." *Id.* In *Johnson v. Peterbilt of Fargo, Inc.*, 438 N.W.2d 162, 163–64 (N.D.1989) (citations omitted) (emphasis added), this Court explained:

Public policy, with respect to contract provisions, is a principle of law whereby a contract provision will not be enforced if it has a tendency to be injurious to the public or against the public good. Whether a particular provision is against public policy is generally provided for by statute or by the State Constitution.

However, *when a contract provision is inconsistent with fair and honorable dealing, contrary to sound policy and offensive to good morals, courts have the authority to declare the provision void as against public policy.*

Under the Restatement (2d) of Torts § 496B, "[a] plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy."

[¶ 29] Statements of public policy come from legislation, and courts must look at constitutions, statutes, regulations, and ordinances to ascertain the policy embedded in the law. 15 *Corbin, supra,* § 79.2 (citing Restatement (2d) of Contracts § 179 (1981)). "A public policy against the enforcement of promises or other terms may be derived by the court from ... legislation relevant to such a policy." Restatement (2d) of Contracts § 179(a) (1981).

More often the statutes or other legislative statements of public policy prohibit certain conduct but do not deal with the issue of the enforceability of a contract involving such conduct. In these cases, the courts must look at the policy represented or expressed by the legislative enactment and must decide whether that policy would be offended by full or partial enforcement or by some other remedy.

15 *Corbin, supra,* § 79.2. "A public policy against the enforcement of promises or other terms may be derived by the court from ... the need to protect some aspect of the public welfare." Restatement (2d) of Contracts § 179(b) (1981). The North Dakota legislature has made safe, supervised child care the public policy of the state of North Dakota.

[¶ 30] The North Dakota Legislative Assembly has made it clear that child care is a priority in this State. Linda Reinicke, Program Director for Child Care Resources & Referral, in testimony offered during the 63rd Legislative Assembly, stated: "The Legislature has, over the last six years, invested in strengthening ND's child care. In 2007, the Legislature funded on-line training for child care providers. The 2009 Legislature funded a child care recruitment, training and retention initiative and, in 2011, refunded the initiative." *Hearing on H.B. 1422 Before the House Human Services Comm.,* 63rd N.D. Legis. Sess. (Jan. 28, 2013) (testimony of Linda Reinicke, Program Director for Child Care Resources & Referral) (emphasis omitted) ["*Hearing on H.B. 1422, House*"]. Most recently, in 2013, the legislature funded a child care stabilization initiative. The legislature's position was evidenced through the creation and enactment of amendments to N.D.C.C. ch. 50–11.1. The child care stabilization initiative, originally House Bill 1422 prior to codification, was offered as a solution to the child care "crisis" occurring in North Dakota. *Hearing on H.B. 1422, House, supra* (testimony of Rep. Kathy Hawkens). "Studies conducted in the past year by the U.S. Department of Agriculture's Rural Development agency and the state of North Dakota have shown that child care ranks right behind housing in order of importance for the people who live and work in North Dakota." *Hearing on H.B. 1422 Before the Senate Human Services Comm.,* N.D. 63rd Legis. Sess. (March 11, 2013) (testimony of T.J. Corcoran, founder of the Corcoran School) ["*Hearing on H.B. 1422, Senate*"]. "It is the intent of the legislative assembly that the department of human services change the eligibility requirement for the child care assistance program from fifty percent of the state median income to eight-five percent of the state median income." 2013 N.D. Sess. Laws ch. 376, § 8. The legisla-

ture recognized the need to widen the net regarding assisting North Dakota families with their child care needs. In 2012, Child Care Resource & Referral complied data that shows all but three counties in North Dakota "have less than 30 percent of licensed care to meet demand." *Hearing on H.B. 1422, Senate, supra* (testimony of T.J. Corcoran, founder of the Corcoran School). According to information published by North Dakota Child Care Resource & Referral, as of September 2012, there were 88,936 children between the ages of 0 to 12 years that potentially needed care due to the mother being in the workforce, but the capacity of licensed child care programs, including family, group, center, and school-age, was limited to 33,190 children. *Hearing on H.B. 1422, House, supra* (testimony of Linda Reinicke, Program Director for Child Care Resources & Referral).

[¶ 31] The application for the 21st Century Community Learning Center grant, offered as exhibit 1 ("exhibit 1") in support of the Missouri Valley Family YMCA's ("YMCA") brief in support of its motion for summary judgment and declaratory judgment noted that state and federal entities found additional programs were needed in Bismarck during the summer months when school was not in session. This information was also included in the YMCA's brief. In exhibit 1, the need was identified as "critical" for many reasons, including the levels of poverty and lack of services. According to exhibit 1 and the YMCA's brief, children at or near the poverty level were the Extend School Program's ("ESP") targeted clients. Two of the schools participating in the ESP "ha[d] 50.2% and 68.5% of their schools' population living in poverty and unable to afford after hours program[s]" according to exhibit 1. The YMCA's brief also relies on that data. T.D. and her sister were accepted into the program and both received

a full scholarship for the program for the entire summer. The program T.D. was enrolled in was a child care program for children of poor families.

[¶ 32] A majority of jurisdictions hold waivers of liability similar to the one signed by T.D.'s mother are void against public policy. "A majority of courts that have considered the issue have held that public policy precludes ... waiver of a child's cause of action for injuries caused by negligence." 2 J.D. Lee et al., *Modern Tort Law* § 20:45 (2d ed.2002) (citing *Galloway v. State,* 790 N.W.2d 252, 256 (Iowa 2010)). "[T]he majority of state courts who have examined the issue ... have concluded public policy precludes enforcement of a parent's preinjury waiver of her child's cause of action for injuries caused by negligence." *Galloway,* 790 N.W.2d at 256 (citing *Apicella v. Valley Forge Military Academy & Junior Coll.,* 630 F.Supp. 20, 24 (E.D.Penn.1985); *Fedor v. Mauwehu Council, Boy Scouts of Am.,* 21 Conn. Supp. 38, 143 A.2d 466, 468 (1958); *Kirton v. Fields,* 997 So.2d 349, 358 (Fla.2008); *Meyer v. Naperville Manner, Inc.,* 262 Ill.App.3d 141, 199 Ill.Dec. 572, 634 N.E.2d 411, 414 (1994); *Hojnowski v. Vans Skate Park,* 187 N.J. 323, 901 A.2d 381, 386 (2006); *Fitzgerald v. Newark Morning Ledger Co.,* 111 N.J.Super. 104, 267 A.2d 557, 558 (Law Div.1970); *Rogers v. Donelson–Hermitage Chamber of Commerce,* 807 S.W.2d 242, 245 (Tenn.Ct.App.1990); *Munoz v. II Jaz Inc.,* 863 S.W.2d 207, 209–10 (Tex.App.1993); *Scott ex rel. Scott v. Pac. W. Mountain Resort,* 119 Wash.2d 484, 834 P.2d 6, 10–11 (1992)); *see also Johnson v. New River Scenic Whitewater Tours, Inc.,* 313 F.Supp.2d 621, 634 (D.W.Va.2004); *Smith v. YMCA of Benton Harbor/St. Joseph,* 216 Mich.App. 552, 550 N.W.2d 262, 263 (1996); *Childress v. Madison County,* 777 S.W.2d 1, 6–7 (Tenn.Ct. App.1989); *Hiett v. Lake Barcroft Cmty.*

*Ass'n*, 244 Va. 191, 418 S.E.2d 894, 897 (1992). However, other jurisdictions have upheld preinjury releases executed by parents. *See, e.g., Hohe v. San Diego Unified Sch. Dist.*, 224 Cal.App.3d 1559, 274 Cal. Rptr. 647, 649 (1990); *Sharon v. City of Newton*, 437 Mass. 99, 769 N.E.2d 738, 747 (2002); *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 696 N.E.2d 201, 205 (1998). I find the reasoning of the majority of jurisdictions on the issue more persuasive because "the strong public policy in favor of protecting children must trump any competing interest of parents and tortfeasors in their freedom to contractually nullify a minor child's personal injury claim before the injury occurs." 2 J.D. Lee et al., *Modern Tort Law* § 20:45 (2d ed.2002) (quoting *Galloway*, 790 N.W.2d at 258).

[¶ 33] In addition, "[i]n considering whether a release is against public policy, other courts generally have considered: (1) the disparity of bargaining power between the parties in terms of compulsion to sign the agreement and lack of ability to negotiate elimination of the clause, and (2) the types of services provided by the party seeking exoneration, including whether they are public or essential services." *Reed*, at ¶ 26 (citing *Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 923 (Minn. 1982); *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 784 (Colo.1989); Restatement (2d) Contracts § 195 (1981)). To determine whether there was a disparity in bargaining power, courts must find more than just a contract offered on a "take it or leave it" basis. *Schlobohm*, 326 N.W.2d at 924. Courts must determine if there was an opportunity for negotiation and if services could be obtained elsewhere. *Id.* at 924–25. To determine whether the services were public or essential or not, courts must "consider whether it is the type generally thought suitable for public regulation." *Id.* at 925. "Further,

in the determination of whether the enforcement of an exculpatory clause would be against public policy, the courts consider whether the party seeking exoneration offered services of great importance to the public, which were a practical necessity for some members of the public." *Id.* at 926.

[¶ 34] Contracts of adhesion tend to evidence great disparity of bargaining power between parties. An adhesion contract is defined as "[a] standard-form contract prepared by one party, to be signed by the party in a weaker position, usu. a consumer, who adheres to the contract with little choice about the terms." *Black's Law Dictionary* 342 (8th ed.2004). "Under North Dakota law, a consumer transaction which is essentially a contract of adhesion will be examined by the courts with special scrutiny to assure that it is not applied in an unfair or unconscionable manner against the party who did not participate in its drafting." *Strand v. U.S. Bank Nat. Ass'n ND*, 2005 ND 68, ¶ 13, 693 N.W.2d 918 (citations omitted).

> When one party is in such a superior bargaining position that it totally dictates all terms of the contract and the only option presented to the other party is to take it or leave it, some quantum of procedural unconscionability is established. The party who drafts such a contract of adhesion bears the responsibility of assuring that the provisions of the contract are not so one-sided as to be unconscionable.

*Id.* at ¶ 15. One leading commentator summarized:

> The concept of unconscionability was meant to counteract two generic forms of abuses: the first of which relates to procedural deficiencies in the contract formation process, ... today often analyzed in terms of whether the imposed-upon party had meaningful choice about

whether and how to enter into the transaction; and the second of which relates to the substantive contract terms themselves and whether those terms ... contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law. *Id.* at ¶ 10 (quoting 8 Richard A. Lord, *Williston on Contracts* § 18.10 (4th ed.1998) (footnotes omitted)).

[¶ 35] According to the YMCA's brief in support of its motion for summary judgment and declaratory judgment, "[b]ased on prior fact gathering by numerous [s]tate and [f]ederal entities, a need was identified for additional programs in Bismarck" during the summer months when school was not in session, which was based on the information provided in the YMCA's exhibit 1. The need was identified as "critical" for many reasons including the levels of poverty and lack of services, in exhibit 1. The ESP was funded by a federal grant obtained by the Bismarck Public School District and the YMCA. As the majority at ¶ 2 recognized and the YMCA offered in its brief, the program was designed, in part, to provide summer educational opportunities "in a stimulating, safe, drug-free, supervised environment to a large number of at-risk students." According to the YMCA's answer to T.D.'s amended complaint, the ESP was developed to address the unmet and unsatisfied needs of low income and underperforming students within the Bismarck Public School system. The YMCA identified the targeted clients for the ESP as young children at or near the poverty level in its brief. According to exhibit 1, two of the schools participating in the ESP "ha[d] 50.2% and 68.5% of their schools' population living in poverty and unable to afford after hours program[s]," which was also acknowledged in the YMCA's brief.

[¶ 36] T.D.'s mother signed the release of liability provisions in the YMCA registration form. T.D. would not have been able to participate in the ESP without her parent's signature on the YMCA registration form. In my view, there was a disparity in bargaining power between the organizations involved in providing the child care services for the ESP and the Dickersons, parents of T.D. There was no negotiating and they had to sign the release or be without summer child care. T.D. and her sister were accepted into the program and both received a full scholarship for the program for the entire summer. All of this information taken together leads to one conclusion: the Dickersons' daughters were within the targeted children of the ESP and the Dickersons had no other options due to lack of services and income level. I am of the opinion that the services offered by the YMCA under the ESP grant were subject to public regulation and essential services for parents like the Dickersons. Enforcement of this release is to the disadvantage of poor children and families and deprives them of the safe childcare so desperately needed as evidenced by our legislature's policy. To present a waiver of a child's rights to parents, like the Dickersons, is offensive against the public policy of North Dakota and "contrary to good morals." *See* N.D.C.C. § 9–08–01(3).

## II

[¶ 37] I would reverse the district court's summary judgment, declare the waiver of liability void and unenforceable as against public policy, and remand for trial.

[¶ 38] MARY MUEHLEN MARING

CROTHERS, Justice, dissenting.

[¶ 39] I respectfully dissent.

[¶ 40] A primary stricture of appellate law is that we decide cases based on issues raised by the parties at the district court and, subsequently, on appeal. *See Rutherford v. BNSF Ry. Co.,* 2009 ND 88, ¶ 13, 765 N.W.2d 705 (" 'It is axiomatic that an issue or contention not raised or considered in the lower court cannot be raised for the first time on appeal from judgment.' *John T. Jones Constr. Co. v. City of Grand Forks,* 2003 ND 109, ¶ 18, 665 N.W.2d 698 (quoting *Bard v. Bard,* 380 N.W.2d 342, 344 (N.D.1986))."). A narrow exception not applicable here exists to recognize certain errors "seriously affect[ing] the fairness, integrity, and public reputation of criminal jury trials." *State v. Borner,* 2013 ND 141, ¶ 25, 836 N.W.2d 383.

[¶ 41] Here, I believe the majority strays from our civil case scope of appeal rule by deciding the release clauses are ambiguous. Ambiguity of those clauses was not an issue advanced by Hillerson on appeal or in the district court. Rather, in the district court Hillerson argued that YMCA's releases were void as against public policy, that the YMCA was not a proper charity to receive immunity under N.D.C.C. § 32–03.1–02 and that the YMCA's liability was not limited under that same Century Code section. Hillerson never used the word "ambiguous" or "ambiguity" in her brief resisting summary judgment before the district court. In a citation in her district court brief she acknowledged our prior decision in *Kondrad v. Bismarck Park District* held that "the parties are bound by clear and unambiguous language evidencing an intent to extinguish liability, even though exculpatory clauses are construed against the benefitted party." 2003 ND 4, ¶ 6, 655 N.W.2d 411. Yet she did not argue the release clauses here were ambiguous. The transcript of oral argument before the district court also shows Hillerson's attorney did not use the word "ambiguous" or "ambigu-

ity," although counsel for the YMCA makes several references to the terms.

[¶ 42] Hillerson's articulated issue on appeal was that "the trial court err[ed] when it decided that the release signed by T.D.'s mother, Kristina Dickerson exonerated the YMCA from all liability for their negligence and granted the YMCA Summary Judgment." However, her brief essentially repeats the argument at the district court, claiming the releases were contrary to public policy. She cited the North Dakota Rule of Civil Procedure 12(e) allowing for a more definite statement where a pleading is vague or ambiguous; otherwise the words "ambiguous" and "ambiguity" do not appear in Hillerson's appellate brief. I therefore dissent because the issue upon which the majority decides this case was not advanced in the district court or on appeal.

[¶ 43]  DANIEL J. CROTHERS

VANDE WALLE, Chief Justice, on petition for rehearing.

[¶ 44] The YMCA filed a petition for rehearing, arguing that we erred in concluding whether the waiver was ambiguous. The YMCA also calls the Court's attention to an error in the opinion. The Court did err at ¶ 3 of the opinion when it stated, "[t]he YMCA concedes in its brief that the number of children exceeded the state and county's child-to-adult ratio requirements." *Hillerson v. Bismarck Pub. Sch.,* 2013 ND 193, ¶ 3. Conversely, in its brief, the YMCA stated, "[o]n June 13, 2008, 42 participants in the ESP program, including T.D., went to the Mandan Community Center to swim. The group was accompanied by seven ESP staff members, which exceeded child-to-adult ratio requirements." The Court was mistaken; however, the error had no substantive impact on this stage of the proceedings. The

petition for rehearing is granted to the extent that we correct the misstatement in the original opinion at ¶ 3. In all other respects the petition for rehearing is denied.

[¶ 45] DALE V. SANDSTROM, CAROL RONNING KAPSNER, MARY MUEHLEN MARING and DANIEL J. CROTHERS, JJ., concur.